# PALM COURT, INC. v DURHAM, et al.

## Case Nos. 86-9123 (CL) F and 86-3885 (CL) F

Fifteenth Judicial Circuit, Palm Beach County

March 28, 1988

### APPEARANCES OF COUNSEL

**Gerald Richman** and **Michael Hanzman** for the Defendants/Counter-Claimants (the "unit owners").

**William Hoppe, Angela Hoppe,** and **James Crabtree** for the Plaintiff/Counter-Defendant.

### OPINION OF THE COURT

DANIEL T. K. HURLEY, Circuit Judge.

### *MEMORANDUM OPINION*

THIS CASE was tried before the court in a five-week bench trial. Gerald Richman, Esq. and Michael Hanzman, Esq. represented the investors-unit owners (the "unit owners"); William Hoppe, Esq., Angela Hoppe, Esq. and James Crabtree, Esq., represented Palm Court, Inc. and its principals ("PCI").

## THE "FIRST WAVE"

Before setting forth the court's findings of fact and conclusions of law, a word is in order about the present posture of the case. This action began when PIC filed a complaint to foreclose sixty-six notes and mortgages which it claimed to have received during the sale and purchase of sixty-six condominium units in the Palm Court Hotel in Palm Beach, Florida. The unit owners counterclaimed for recission, contending that the hotel interests were securities which had been sold in violation of state and federal law.

As the case progressed, it expanded and took on a whirlpool-like quality. Attendance at hearings grew as new parties with batteries of lawyers were swept into the litigation malestrom. Early on, the parties stipulated to a "first wave" proceeding to resolve the claims between PCI and the unit owners. Later, the focus was limited to securities issues.

A pretrial conference was held shortly before trial. There, the court granted a motion to sever and reduce the number of unit owners in the "first wave" to ten. For a time, Carteret Savings and Loan Association ("Carteret") also was a party in the "first wave." During trial, however, it reached a settlement with the unit owners and all claims were dismissed.

Prior to trial the court ruled that recission and foreclosure are equitable actions, triable to the court. Thus, PCI's motion for a jury trial on these issues was denied. Trial exhibits are cited in this opinions as follows: Unit Owners . . . "UO #—"; Palm Court Inc. . . . "PCI #—"; and Carteret . . . "C #—".

Based upon the credible testimony and evidence presented, the court makes the following

## FINDINGS OF FACT

### I. The Concept

Carl Sax came to Florida in the mid-1970s to work as a developer/syndicator. Previously, he had worked with an established New York law firm where he did securities work and provided corporate representation for the firm's multi-national clients. Development and syndication, according to Sax, are related but distinct endeavors. Development entails the orchestration of a construction project. Syndication, on the other hand, involves the acquisition of property and the sale of interests in the property via a private placement memorandum. Usually

the interests take the form of limited partnerships with substantial tax-oriented benefits, i.e., tax shelters.

By 1984 Sax had been involved in several projects in southern Palm Beach County. As a result, he had a working relationship with at least two local lending institutions. Carteret Savings and Loan Association regarded him as "one of its premier borrowers." Robert V. Giggs, the chairman and chief executive officer of Southern Floridabanc, described him as "a good client."

It was about this time, 1984, that Sax heard about the Royal Park Hotel in Palm Beach. This sixty-six-room, mostly-frame structure, located on Cocoanut Row near Worth Avenue, had been built in the '20s and, for a time, had served as a gambling casino. But now the glitter was gone. The building was old and in disrepair. It had all but ceased to function as a hotel, operating more as a guest house to accommodate the owner's extended family. Paying guests were occasionally accepted to maintain the hotel's liquor license. But the hotel's business reputation was nonexistent; it had no advance bookings and no standing guest list. Nevertheless, Sax perceived that the property had investment potential.

In late 1984 and 1985, the federal tax laws were in a state of flux. The continued availability of the investment tax credit for limited partnerships was in doubt. Therefore, syndicators were looking at new forms of ownership to provide investment opportunities with enhanced tax benefits. The "condominium-hotel" seemed the perfect answer. It enabled an investor to purchase a hotel room as a condominium unit and then, by executing a rental management agreement, to place the unit in a rental pool under the supervision of a hotel operator or agent. This arrangement allowed the investor/unit owner to take an investment tax credit during the first year of ownership plus the usual deductions associated with property ownership. Moreover, because the property housed a functioning business, the unit owner could anticipate an eventual participation in the profits.

## II. THE OFFERING

The hotel interests were offered for sale through a prospectus or private placement memorandum ("PPM") which was drafted by PCI's securities counsel, Sparber, Shevin, Shapo, Heilbronner & Book ("Sparber Shevin"). Steven Sonberg, the lead attorney and principal contact at Sparber Shevin, testified that Carl Sax was personally involved in a "significant way" in the preparation of the PPM. According to Sonberg, it was Sax who decided what should be included and excluded from the PPM.

*See, e. g.* UO #29.

16

## PART ONE, REPRESENTATIONS IN THE PPM

### (A) WORKING CAPITAL

Page 22 of the PPM contains a listing entitled, "Use of Sales Proceeds." It indicates that PCI anticipated receiving $13,900,000 in total proceeds from the sale of the sixty-six condominium units in the Palm Court Hotel. It also indicates that $75,000 of the proceeds would be allocated for "Hotel Working Capital." Footnote #3 to the chart, which appears on page 23 of the PPM states, "To the extent costs are greater than the amount indicated, PCI's profit will be decreased."

William T. Hurst, the vice president for operations of Py-Vavra Development Company offered this definition of a hotel's working capital: "In conventional hotel accounting working capital refers to several different items, including funds to make change from, house banks like petty cash, and to cash checks on property; salaries and wages for some period of two to eight weeks; and general immediately available cash to carry you through the waiting time, the float on accounts receivable, and the peaks and valleys of seasonal hotel operations. It's sort of like cash-on-hand for immediate day-to-day operating purposes." *Depo.,* at 49.

On December 31, 1985, when the hotel was turned over to the unit owners, the working capital fund contained no more than five or six thousand dollars.

The lack of working capital resulted from PCI's contention at the closing that it had experienced cost overruns in three areas: (1) nonconsumable supplies ($9,268.97); (2) start up expenses ($43,840.47); and (3) hotel working capital ($30,813.37). These alleged overruns totaled $83,922.81. *See* UO #64. PCI asserted that the cost overruns inured to the unit owners' benefit and, consequently, demanded reimbursement in the sum of $84,000. Louis Hautzig, who attending the closing as the authorized representative of P-V Hotels, Inc., the unit owners' designated agent to operate the hotel, signed what has become known as the "transfer letter," acknowledging the $84,000 debt. *See* UO #66. Thus, the working capital fund was decimated by PCI before the hotel began to operate.

Significantly, each of the three categories in which PCI claimed a cost overrun was listed on the PPM's use-of-proceeds chart. And with respect to each of these categories, PCI had expressly represented that cost overruns would be borne by PCI. *See* UO #16, n. 3.

**17**

Professor James J. Eyster of the Cornell School of Hotel Management testified that adequate working capital is an essential element for the sound operation of a successful hotel. He too described a hotel's working capital as the money which is used to pay the operating bills on a day-to-day basis. He opined that $100,000, rather than $75,000, would have been necessary for a hotel like the Palm Court. He went on to say that if the hotel agent had only five or six thousand dollars in the working capital fund on January 1, 1986, this would have constituted inadequate funding which, in turn, would have had a significant, adverse impact on the hotel's operation and success.

Similarly, Charles Ilvento, a professor of hotel management at Florida International University, testified that a hotel of the Palm Court's size required between $150,000 and $200,000 to be on hand to meet anticipated expenses. In his view, if the hotel actually had only $5,000 in its working capital fund, there would have been no wa that the hotel could have met its normal operating expenses.

As indicated by Louis Hautzig, the depletion of the hotel's working capital account left the management without sufficient funds to operate the hotel. For example, there was not enough money on hand to make the January 15th, 1986, payroll. A crisis was averted only when Mr. Horwitz came forward and advanced $20,000. Later PCI advanced additional monies. But these were loans which had to be repaid. John Petiya, the hotel's in-house accountant, confirmed that the hotel never had any substantial amount of money. According to him, PCI "spoon fed" the hotel. The trickle was cut off when Sax informed the management that it would not get additional monies until the hotel began to turn a profit. Robert von Bereghy, the executive vice president of P-V Hotels, Inc., testified that the lack of adequate working capital caused the hotel to run out of money, get behind in its bills and be seen as a poor credit risk.

In summary, the hotel's working capital account, which PCI represented would be funded in the amount of $75,000, and which was essential to the successful operation of the hotel, was wiped out by PCI's assertion that it had spent the entire $75,000 prior to opening. On top of this, PCI claimed an entitlement to $84,000 for cost overruns. Putting aside the validity of PCI's contentions, the court finds that PCI determined not to fund the hotel's working capital account as of December 27, 1985,—before the closing—and failed to disclose this information to the unit owners.

### (B) $300,000 — ADVERTISING

The use-of-sales-proceeds chart on page 22 of the PPM also reflects

18

that $300,000 will be allocated for "advertising". Left unsaid is whether the advertising is to promote the hotel or the syndication offering.

The precise amount expended for pre-opening advertising for the promotion of the hotel is difficult to ascertain. Whatever the figure, it did not exceed one hundred thousand dollars. And in any event, PCI took the position at trial that the $300,000 was never intended to promote the hotel. Rather, PCI claimed that the money was for the promotion of the syndication.

The hotel industry uses various methods to calculate an appropriate amount for pre-opening advertising. One method suggests taking the first year's advertising budget and then doubling that number. Professor Eyster said that for a small hotel like the Palm Court it would be appropriate to use five per cent of sales as the advertising budget and then to double this figure to reach an appropriate pre-opening advertising budget. If PCI had elected to use this formula for the Palm Court, it would have designated $340,000 as the pre-opening advertising budget. As Professor Eyster indicated, the $300,000 listed on the PPM's use-of-proceeds chart for "advertising" is within recognized parameters for pre-opening advertising and, thus, it would be reasonable for an informed investor to conclude that the listed figure represented PCI's commitment for pre-opening hotel advertising.

Professor Ilvento discussed a second method for calculating a hotel's pre-opening advertising budget. He talked about the industry's rule of thumb which calls for spending between five and eight thousand dollars per room. In his opinion, a small hotel like the Palm Court, which does not have the benefit of a national reservation system, should spend between seven and eight thousand dollars per room for its pre-opening advertising budget. This calculation calls for a pre-opening advertising budget of approximately $462,000. Thus, Professor Ilvento also concluded that an informed investor, familiar with the standards and practices in the industry, would reasonably conclude that the $300,000 figure specified for "advertising" in the PPM's use-of-proceeds chart represented the Palm Court's pre-opening advertising budget.

This interpretation was not limited to industry experts. Steven Sonberg, PCI's securities counsel, testified that he too was under the impression that the $300,000 listed for advertising in the PPM use-of-proceeds chart was to advertise the hotel. Sonberg had been in constant contact with the principals of PCI throughout the drafting process and testified that no one ever suggested that the $300,000 was to pay for the promotion of the syndication.

Mr. Horwitz testified at trial that the principals of PCI reviewed the private placement memorandum which had been circulated in connection with the sale of hotel interests in the Brazilian Court Hotel. He indicated that the idea for the categories listed on Palm Court's use-of-sale-proceeds chart came from a similar chart in the Brazilian Court's PPM. The categories on the Brazilian Court's chart, however, are substantially more detailed than those provided by PCI. For example, as opposed to PCI's cryptic "advertising" category, the Brazilian Court's chart contains this descriptive listing: "Offering costs, including marketing of units, costs of state law compliance, both securities and real estate, related legal services, printing, accounting and related services (1) . . . $400,000." *See* UO #223.

Accordingly, the court finds as a matter of fact that an informed investor, reviewing the use-of-proceeds chart on page 22 of the Palm Court PPM, would reasonably conclude that the $300,000 specified for "advertising" was to be used for pre-opening advertising to promote the hotel.

### (C) MORTGAGE FINANCING

When the project was conceived, PCI intended that Southern Floridabac Savings Association ("SFB") would serve as the end-loan lender, i.e., the bank would provide an 80% mortgage loan for each condominium unit. The PPM at page 54 states that "Southern Floridabanc Savings Association (the "Mortgage Lender") has issued its commitment to provide recourse financing for up to 80% of the Purchase Price of the Hotel Interests to qualified Unit Owners." The PPM further indicates on page 55 that "PCI will provide recourse financing for up to ten percent (10%) of the Purchase Price to Unit Owners."

At Richard Strother's urging, and before the offering was made, the financing was changed from recourse to nonrecourse. As explained by Mr. Sax, recourse financing means that upon a default a lender may have recourse against the investor/borrower. Nonrecourse financing requires that a lender look to the property alone. In this case, PCI developed a hybrid form of nonrecourse financing. It created a "put option" which permitted a unit owner, at the end of five years (when the investsment tax credit would be completely amortized), to put the condominium unit back to PCI and walk away from the project.

The put option was for the sole benefit of the unit owners. Moreover, it had a profound impact on the overall financing scheme. Prior to the change, SFB and PCI intended to take their respective 80% and 10% notes and sell them in the secondary market. They soon learned,

however, that the nonrecourse provision made the notes, for all practical purposes, unnegotiable.

A second, unrelated favor also affected the financing plans. SFB's compliance officer questioned whether the bank, in light of its 25% profit participation agreement with PCI, could fund the 80% mortgage loans without violating certain federal banking regulations. These two concerns, *viz,* the inability to sell the notes in the secondary market and the possibility that the loans could be found to violate the "loan-to-one-borrower" rule, caused SFB to request that PCI find an alternate source of funds. This is evidenced by a memorandum, dated November 29, 1985, from Sax and Horwitz to Larry Reger and Robert Gibbs. It states, "[W]e have been unable, as yet to secure . . . a firm end loan commitment to permit the sale and closing of the hotel/condominium. . . ." *See* UO #43; *see also* PCI #1311.

Sax and Horwitz contacted Carteret by memorandum, dated December 23, 1985, and informed it that SFB was having difficulty with its commitment to issue the end loans. *See* UO #57. Carteret ranked Sax and Horwitz among its "premier borrowers" and, therefore, agreed to enter into a substitution of collateral agreement whereby Carteret released its lien on the property and, in place thereof, accepted an assignment of the sixty-six notes and mortgages. *See* UO #70. Additionally, PCI, SFB and Carteret entered into a buy-sell and tri-party agreement which obligated SFB to repurchase the notes and mortgages from Carteret at the end of one year. *See* C #8.

All of the foregoing information was known to PCI prior to the closing. But it was not disclosed to the unit owners. To the contrary, each unit owner signed an adjustable rate note which specified that "[t]he Lender is SOUTHERN FLORIDABANC SAVINGS ASSOCIATION." *See, e.g.,* UO #167.

### (D) LEASES

The PPM on page 22 under the heading, "Hotel Agent's Powers and Duties," notes, among other things, that the "Hotel Agent is authorized to rent equipment and miscellaneous furniture and furnishing, including, but not limited to, telephone equipment, front desk and office equipment, furniture, computers, telephones, televisions, interior plants, signage, TV satellite antennae and billboards on behalf of all Unit Owners." *See* UO #16 at 42. Pursuant to this provision, PCI and/or the hotel agent leased various equipment including a telephone system, televisions, bakery equipment and two Rolls Royces. Thomas E. Vavara testified that leasing such equipment is a normal and well-accepted practice in the hotel industry.

## (E) CERTIFICATE OF OCCUPANCY

The PPM on page 53 under the heading "Closing", states that "Closing shall occur . . . upon the occurrence of all of the following events . . . (1) PCI has obtained a certificate of occupancy for the Hotel." *See* UO #16 at 53.

The Town of Palm Beach issued a conditional certificate of occupancy on December 27, 1985. *See* UO #63.

According to Louis Hautzig, when the hotel opened on December 31, 1985, about fifteen of the sixty-six rooms were ready for occupancy. Substantial work remained to be done. George K. Kennedy, who had been associated with TransCon Construction Company and who supervised the renovation of the Palm Court, testified that during the month of January, 1986, thirty to forty workers, involving fifteen to twenty trades, were working at the hotel on a daily basis. Carpentry work was being done on the third and fourth floors and chick wire covered the main staircase railing. In February, the construction work force was reduced to ten and, by April, the job was almost done.

The Town of Palm Beach issued a final certificate of occupancy on February 17, 1986. *See* UO #101.

The principals of PCI did not notify the unit owners, prior to closing, that a conditional, rather than unconditional, certificate of occupancy had been issued. Nor did they disclose that substantial portions of the hotel were incomplete and unavailable for occupancy. To facilitate the closing, Sax orally represented that all preconditions to closing had been satisfied. Additionally, he signed an incumbency certificate in which he represented that "[a]ll the events of Closing specified on Page 53 of the Memorandum as preconditions of Closing have occurred, including: (a) Issuance of a Certificate of Occupancy." *See* UO #73.

The court accepts the testimony of Thomas E. Vavra that it is standard practice in the hotel industry to open a new hotel with a conditional certificate of occupancy.

## (F) INSURANCE

The initial draft of the PPM listed the proposed insurance coverage as follows: "[P]roperty and casualty insurance . . . with limits of liability of $12,510,000 for property damage, $2,400,000 for loss of rents, $900,000 for business interruption insurance, $1,000,000 for public liability for all persons injured in any one accident and occurrence, $250,000 for flood insurance, and an umbrella policy of not less than $10,000,000." *See* UO #16 at 40.

Richard Strother, who had prior experience in marketing hotel/condominium offerings, required, as a condition of his involvement, that the umbrella policy provision be increased. Accordingly, page 5 of the addendum to the PPM (which is located at the front of the booklet) states, "The 'umbrella policy' described on page 40 of the Memorandum and referred to elsewhere has been increased from $10,000,000 to $30,000,000 and will be increased in annual increments to a level of $50,000,000 no later than five years from the date Closing." *See* UO #16 at 5 of addendum.

The PPM at page 53 under the heading, "Closing", states: "Closing shall occur . . . upon the occurrence of all of the following events . . . (9) the insurance described under 'SUMMARY OF CONDOMINIUM DOCUMENTS—Declaration' has been obtained."

In 1985, the insurance industry in Florida was in chaos. Rates were unstable, sometimes doubling and tripling. So unpredictable was the market that some companies decided to withdraw from the state. Arthur Py was aware of this because he had encountered insurance problems with other hotels being managed by P-V. He advised Sax and Horwitz to begin immediately to find the necessary coverage.

Horwitz dealt with Robert W. Beatty of Lawley Service, Inc. in Buffalo, New York. Beatty, in turn, contacted Gary P. Lawrence, an insurance agent in Delray Beach, Florida. Beatty told Lawrence of the difficulty he was encountering in locating the required coverage. Insurers were reluctant to issue coverage for a frame structure located on a barrier island. Lawrence stated unequivocally that he could not provide a $30,000,000 umbrella policy; his authority was limited to $1,000,000 and he agreed to issue a binder for this amount. He also agreed to ask his company, Nationwide, to consider increasing the umbrella policy to $5,000,000. As for the $12,510,000 in property damage insurance, Lawrence agreed to issue a binder for this subject to the company's right to inspect the property and, thereafter, to recalculate the amount of coverage. The hotel was inspected on December 10th, 1985, and sometime after the first of January, 1986, the property damage coverage was reduced to $2,170,000.

On December 30th and 31st, 1985, the dates of the two-day closing, the hotel had the following relevant insurance coverage: (1) a binder for $12,500,000 for property damage which was subject to reduction after inspection and (2) a binder for a $1,000,000 umbrella policy. (There is a conflict between Beatty and Lawrence as to whether the $1,000,000 umbrella policy was bound on the date of closing. For the purposes of this opinion, the court accepts Lawrence's testimony.)

23

PCI failed to disclose to the unit owners, prior to the closing, that it had not obtained the level of insurance coverage specified in the PPM.

Sax orally represented that the preconditions for closing had been satisfied and later signed a certificate of incumbency in which he stated, "All the events of Closing specified on Page 53 of the Memorandum as preconditions of Closing have occurred, including: (i) Insurance Secured or Under Application." *See* UO #73.

## PART TWO, OMISSIONS IN THE PPM

## (A) PALM COURT MISSED THE '86 SEASON

The one portion of the PPM which played a significant role in virtually every unit owner's decision to purchase a hotel interest at the Palm Court was the forecasted statement of income and cash flow, listed as exhibit 1 to the Pannell Kerr Forster (PPKFP) report. This forecast projected that the hotel, in 1986, would generate $1,235,000 before considering the unit owner's direct expenditures and depreciation allowances. *See* UO #16, Exhibit "C", Exhibit 1. In other words, PKF estimated that the hotel would make money during its first year. The primary source of this revenue, as noted by Robert von Bereghy, was room sales, not the hotel's restaurant. PKF projected that the Palm Court would enjoy near 100% occupancy during the "high season," the period that runs from mid-December until Easter. During this period the hotel could charge its highest rates, up to $300 per night, and garner its greatest revenues. In short, a successful high season was critical to the hotel's cash position in 1986.

From the very beginning, the Palm Court targeted an upscale market —guests who would be willing to pay an extra premium for top quality service in an exclusive atmosphere. To attract this clientele, however, the hotel had to begin marketing itself at least six months prior to opening. Industry studies show that visitors to Palm Beach tend to make reservations about six weeks prior to arrival. Moreover, the Palm Court, which did not have a national reservation service and was not located on a major thoroughfare, could not anticipate significant walk-in business.

PCI started too late to catch the 1986 high season. Ms. Wagener, the hotel's director of sales, was not hired until October 30, 1985,—two months before the hotel opened. Before this, no one was at the hotel to sell rooms. Indeed, Ms. Wagener testified that from the very beginning she realized that PCI's goals for 1986 were unrealistic and that the high season had been missed. The hotel had failed to participate in any of the fall trade shows and there was no way to catch up.

24

Andrea Anker of Spector/Anker Associates, the hotel's advertising agency, told a similar story. She informed Sax during the summer of 1985, that advance advertising was necessary to attract seasonal guests and that it had to be placed four to six months prior to opening. Many magazines have three-to-four-month deadlines and the agency required a month to prepare the ads. Nonetheless, Spector/Anker was not retained to place advertising until August 30, 1985,—four months before the hotel opened its doors. The first paid advertising appeared in late November or early December, 1985, and, as Ms. Anker observed, it had minimal effect.

As could have been predicted, the worst came to pass. The hotel received almost no advance reservations. Louis Hautzig, who was associated with P-V Hotels, Inc., said that it didn't take a mental giant to realize that the hotel would not attain the PFK projections. From his experience, he knew that most business would have been generated by advance bookings and, therefore, when he saw only three or four advance reservations prior to opening, he realized it was a foregone conclusion that the hotel had missed the 1986 high season and that it faced economic disaster. Robert von Bereghy used a more descriptive metaphor. He likened the Palm Court to a "neutron hotel" in which "the bomb goes off, the investors are wiped out and the hotel is left standing."

Professor Eyster's analysis pointed in the same direction. He characterized Palm Beach as a destination resort for which people book well in advance. He noted that it was extremely important to acquaint travel agents with the hotel and that even after this was done, most travel agents would be reluctant to recommend a newly-opened, untested facility. In his view, PCI's decision to open at the beginning of the high season created an inordinate high degree of risk. Since the hotel's operating expenses are fixed, low advance sales signified a serious downside risk. Professor Eyster opined that with the late print media, few advance reservations and construction still in progress, the Palm Court had not reasonable expectation to make money durings its first year.

PCI, of course, was aware that it had been late in placing pre-opening advertising, that the hotel had received few advance reservations, and that construction was far from complete prior to opening. Yet it failed to revise the PKF projections or otherwise notify unit owners that the '86 season had been missed.

### (B) RESTAURANT UPGRADE

After the PFK projections were prepared, PCI decided to upgrade

**25**

the hotel's restaurant by hiring Andre Surmain, a world-renowned chef. The addendum to the PPM announced Mr. Surmain's hiring, but failed to advise investors that upgrading the restaurant could have a significant, negative impact on the PKF projections.

The PKF projections for the hotel's food and beverage service were predicated on PCI's original plan for a modest restaurant with an average dinner check of $30 per person. This scenario allowed for a projected profit of $179,000 in 1986. The Surmain restaurant, however, anticipated an average dinner check of $75 per person. At the same time, the costs associated with the Surmain operation were significantly higher. To begin with, Mr. Surmain commanded an annual salary of $100,000 plus a profit participation in revenues over a specified amount. Added to this were the costs of his staff which was larger and more expensive than originally intended.

John Crow, who worked for PKF preparing the market demand report on the Palm Court, testified that the upgrade of the hotel's restaurant materially affected PKF's projections. He expressed his belief that the hotel's restaurant under Chef Surmain would experience "negative profitability," i.e., it would lose money. He explained that restaurants which specialize in haute cuisine are considered "lost leaders" in the hotel industry because of their high overhead and above average cost of operation.

Professor Eyster echoed these sentiments. While Chef Surmain's name and association with the hotel would heighten its profile, there would be a serious downside. Fixed expenses would soar. The restaurant might do well in the three-month high season, but its high fixed costs would probable cause it to lose money over a twelve-month period.

The restaurant did worse than predicted. It grossed $815,170 during the first four months of operation. But it had $811,365 in expenses. Thus it made only $4,000 during the most profitable period of the year. Moreover, the $4,000 figure does not include undistributed operating expenses which, when factored in, reveal an actual loss of $95,000 for the first four months of 1986. *See* UO #152.

Despite PCI's assertions to the contrary, the proof is overwhelming that PCI gave Chef Surmain free rein over the hotel's food and beverage operation. Sax told Robert von Bereghy not to ruffle Surmain's feathers. Mr. Horwitz, at trial, described Chef Surmain's ego as "large enough to fill the courtroom." Yet the record is replete with examples of PCI's refusal to take appropriate measures to restrain Mr. Surmain and permit the management to reassert central control. Louis

26

Hautzig told how Chef Surmain drew a figurative line between the restaurant and the hotel and announced that the management should stay on its side and he would remain on his. Indeed, the chef seems to have taken this literally because, for a time, he refused to venture beyond the restaurant to provide room service or food at poolside. Occasionally, he also declined to accept dinner reservations from hotel guests. Management's pleas for Sax's intervention went unanswered and it soon became apparent that PCI sanctioned Surmain's conduct. Within days after the hotel opened, Sax and Horwitz were exploring the possibility of terminating P-V in order to turn the management over to Surmain.

The independent status conferred by PCI on Chef Surmain had a significant, negative impact on the PKF projections. Those figures were based on an assumption that the hotel management would retain central control over all departments, including the food and beverage operation. Another assumption in the PKF projections was that the restaurant's kitchen would provide full room service and other amenities. This was an "important assumption," according to Mr. Crow. Professor Eyster described the desired relationship between the hotel management and the food and beverage department as a "hand-in-glove" concept. It is exceptionally rare in the hotel industry, he said, not to have the food and beverage department under the direct supervision and control of the hotel management. Hotel services must be delivered in a unified format. Consequently, Professor Eyster expressed the opinion that Chef Surmain's independent status represented a material change from what had been closed in the PKF projections.

Finally, and as no surprise, there was a serious and, at times, bitter dispute between Chef Surmain and the hotel management. P-V had intended to hire a different, less expensive chef. It took the position that the Palm Court, with its sixty-six rooms, could not support a $100,000-a-year chef. The Palm Beach zoning code prohibited the restaurant from advertising as an independent entity. This, coupled with the high costs of operation, led the hotel agent to question the wisdom of PCI's decision to impose Mr. Surmain on the Palm Court.

PCI failed to disclose that (1) the upgrade of the hotel's restaurant would have a material, negative impact on the PKF projections, (2) the independent status conferred on Chef Surmain conflicted with several assumptions in the PKF study and would have a material, negative impact on the PKF projections, and (3) the dispute between Chef Surmain and the hotel management would have a material, negative impact on the PKF projections.

27

## (C) PCI'S LOSS OF CONFIDENCE IN MANAGEMENT

PCI selected and contracted with the Py-Vavra companies ("P-V") (Py-Vavra Development Inc., Py-Vavra Architects, Engineers, Inc., and P-V Hotels, Inc.) to prepare and manage the Palm Court. *See, e.g.,* UO #12.

Relations between PCI and P-V were cordial while William Hurst served as P-V's on-site representative. Things changed, however, after Hurst's departure in April, 1985. Although Mr. Horwitz claimed that PCI continued to have confidence in P-V's expertise, the record demonstrates otherwise. In his deposition, by which he was impeached at trial, Mr. Horwitz allowed that there had been "a lot of problems" between PCI and P-V in late 1985. Horwitz admitted that he was "sorely disappointed" with Louis Hautzig, Hurst's replacement, and referred to him as "Field Marshall von Hautzig." Again in his deposition, discussing the extent of PCI's problems with P-V, Horwitz said, "We were unhappy . . . it may elongate my deposition by a day."

The correspondence between PCI and P-V exemplifies the rupture. On May 29th, 1985, Sax and Horwitz wrote to Thomas Vavra, requesting that he "fill the void created by Bill Hurst's departure." *See* UO #14. The memo went on to request that P-V get busy with the basic requirements for the hotel, e.g., "a) selection of general manager; b) preparation of menus; c) selection of chef; d) ordering of brochures;" etc. The message was clear: P-V was not doing its job and PCI was being forced to shoulder the burden. A month later, on June 28th, 1985, Horwitz wrote to Vavra and again complained that PCI was awaiting "an interview with your new Bill Hurst." *See* UO #15. The tone sharpened on August 6th, 1985, when Sax and Horwitz wrote to Arthur Py and Thomas Vavra and stated, "We're said it before, and we'll say it again: We retained Arthur Py and Thomas Vavra to provide hotel expertise and not crisis management. Don't disappoint us."

On August 13th, 1985, Sax and Horwitz issued an in-house memo in which they stated, "Unfortunately, the performance of Py Vavra Development, Inc. as technical services consultant has been far from satisfactory. In connection therewith, we intend to renegotiate downwards the technical services fee in keeping with prior performance." *See* UO #21. In fact, PCI reduced P-V's $150,000 contractual fee by $65,000. *See* UO #12. P'V "consented" to this, according to Arthur Py, because Sax and Horwitz threatened to exert pressure against Thomas Vavra and make life difficult for P-V. Sax and Horwitz mentioned the pending law suit against Vavra by which, they said, they could take Vavra under and, in effect, become Py's partners.

28

Horwitz characterized this as the "normal pushing and shoving" that takes place in a business relationship. Other witnesses more accurately described the disintegration of the relationship with the resulting total loss of confidence and mutual trust. Louis Hautzig described Carl Sax as "impossible to deal with," someone who was "crude, rude and would fly off the handle." Andrea Anker testified that over the course of several months in 1985, Sax indicated his distress at P-V's management. She said he called P-V Hotels, Inc. "incompetent". When asked why he didn't fire them, Sax responded, "it was impossible at this time." Later, in a memo dated January 16th, 1986, Sax referred to the P-V management team "turket schleppers." *See* UO #83.

At the closing PCI obtained the right to terminate the hotel management if it failed to meet certain criteria. Nine days later Sax and Horwitz issued an in-house memo in which they indicated that they had visited the hotel on January 3rd—three days after the closing—and informed the management that it would be replaced if it did not shape up. They further stated, "as a fallback, we have requested that Andre Surmain contact Jean-Louis Lambacher who is a manager of the Martinez, a five-star hotel run by the Tatinger chain, in Cannes, France. Jean-Louis will be in California later this month and we are trying to arrange to have him come to Palm Beach to determine his availability. Carl has previously interviewed Jean-Louis in France and he comes with Andre's highest recommendation. We will use him to replace Criado [P-V's manager] if we are not satisfied and Jean-Louis is available." *See* UO #225.

P-V Hotels, Inc. was terminated on February 10, 1986. Although Sax and Horwitz testified that they did not reach their decision until the second week of January, 1986, the court finds, as a matter of fact, that well before the closing PCI lost all confidence in P-V's ability to fulfill its contractual obligations and concluded that P-V would have to be replaced. Nonetheless, PCI failed to disclose this information to the unit owners until after the closing.

### (D) P-V QUESTIONS PKF PROJECTIONS

Robert von Bereghy, of P-V Hotels,Inc., reviewed the PKF projections in the fall of 1985 and concluded that the numbers were not attainable. PKF had projected an annual room rate of $152 and von Bereghy doubted that the Palm Court could achieve this goal. Von Bereghy had substantial experience with south Florida hotels and felt that PKF's projected numbers were at least double what they should be. He discussed his concerns with Arthur Py and Thomas Vavra and they agreed that P-V had an affirmative obligation to place its position

29

on the record. Accordingly, they instructed Louis Hautzig to notify PCI.

Before contacting PCI, Hautzig decided to talk with PKF. He spoke to John Crow, who had prepared the PKF projections and told him that the numbers appeared to be excessive, that a first year occupancy rate of 63% seemed too high. To achieve the PKF projected annual room rate of $152, it would be necessary to charge $300 during the high season and this, in Hautzig's view, was impossible. Overall, he felt that PKF projections were 25%–30% off. Mr. Crow readily admitted that the decision to upgrade the hotel's restaurant, which was made after the projections had been prepared, invalidated some of the projections. He expected the "costs of [restaurant] sales to be much higher and payroll expenses to greatly exceed those for . . . a more modest restaurant. We did not, for example, foresee the need for a $100,000 chef or the attending staff he will require." At the same time, Crow felt that the PKF projections for room rates "are still appropriate." See UO #34.

Hautzig informed Sax and Horwitz, on December 2, 1985, that he had talked with Crow and others at PKF. He stated that "it is the opinion of Management and equally endorsed by P.K.F., that earnings may not be as optimistic as first stated in their study." Hautzig also suggested that "revisions may have to be made, to insure a more correct budget." See UO #45. Two days later, Sax wrote to Hautzig and said, "Until the above items are clarified, corrected and approved by Lanny [Horwitz] and myself, none of the information forwarded by your letter of 12/2/85 should be forwarded by you, Luis Criado, Marilyn, or anyone else to no other person except Lanny, myself or the Py-Vavra staff." See UO #46 (emphasis in original).

Robert von Bereghy testified to a contemporaneous telephone call in which Sax said that the disclosure of Hautzig's information would "blow the deal." Arthur Py's recollection was more vivid. He remembered that Sax and Horwitz were upset because Hautzig had taken it upon himself to talk with PKF. Sax and Horwitz wanted Hautzig to support the PKF numbers and said that if he did not, they would take other measures against P-V. The conversation was tense; Sax and Horwitz were screaming, threatening to bring pressure to bear against P-V. Py told them that P-V would not support any numbers which it felt were unreliable. The call ended with Sax's admonition that P-V was not to tell anyone about its concerns.

PCI failed to disclose to the unit owners that P-V, the management company selected by PCI to operate the hotel, disputed the accuracy of

30

the PKF projections. On the contrary, Sax made express representations at the closing that the PKF projections were still accurate.

## (E) LAW SUIT AGAINST THOMAS VAVRA

Arthur Py and Thomas Vavra formed Py-Vavra Architects & Engineers, Inc., a Wisconsin corporation in 1964. This company specialized in architectural and engineering services to the hotel industry. In 1964, they formed Py-Vavra Development, Inc., also a Wisconsin corporation, to provide technical services for hotel development. Finally, in 1981, they formed P-V Hotels, Inc. as a Wisconsin Corporation and a wholly owned subsidiary of Py-Vavra Development, Inc. This last entity managed the hotels in which the parent company had an interest. Thomas Vavra was a principal and played a significant role in each of these companies.

PCI entered into agreements involving the Palm Court with each of the P-V companies.

In late November, 1985, Carl Sax, Lanny Horwitz and Lawrence Reger, the three PCI principals, filed suit against Thomas Vavra in the United States District Court for the Southern District of Florida. The complaint alleged that Vavra was guilty of (1) breach of contract, (2) fraud, (3) violating the federal racketeering act, (4) violating the Florida theft statute and (5) violating the Florida racketeering act. *See* UO #135.

Sax and Horwitz consulted with counsel and determined not to disclose information about the pending Vavra suit to the Palm Court investors. Accordingly, no disclosure was made.

## (F) FINANCIAL INFORMATION ABOUT SAX, HORWITZ & PCI

Under the original plan for the Palm Court offering, PCI would have obtained its profit at the closing and been able to walk away from the project. This changed, however, with the introduction of the put option. Mr. Strother's insistence on nonrecourse financing and the resulting introduction of the put option had the practical effect of making all of the unit owners' notes unnegotiable. Thus, PCI was prepared to stand by the project for five years and await its profit.

Strother obtained a second benefit for the unit owners by requiring PCI to increase the escrow fund from $625,500 to $938,250. *Compare* UO #16 p. 44 *with* pp.1-2 of addendum; *see also* UO #72. Thus, PCI established a line of credit with the Liberty Norstar Bank in Buffalo, New York. As envisioned, this money was to be available if the hotel experienced a negative cash flow.

**31**

Sax and Horwitz consulted with counsel and determined that in light of the put option and the $938,250 line of credit, it was not necessary to include financial information about Sax, Horwitz or PCI in the PPM. Accordingly, this information was not disclosed to potential investors.

### (G) NONCONFORMING USE

Robert Moore, the Palm Beach building official, testified that the Palm Court hotel is both a nonconforming use and a nonconforming structure. *See* UO #224.

The PPM indicated that the hotel was located in a residential neighborhood but failed to disclose that it was a nonconforming use and a nonconforming structure.

---

From the foregoing, the court reaches the following

### CONCLUSIONS OF LAW

(1) The hotel interests offered for sale in this case constitute "investment contracts," and are securities within the meaning of federal and state law. (PCI admitted that the Palm Court Hotel interests constituted securities.)

(2) The transaction involving the offering and sale of hotel interests in the Palm Court is subject to Florida law.

The court reaches this conclusions for three reasons. First, the evidence firmly establishes that hotel interests were offered for sale within the state of Florida. Dr. Norman Bernstein, a Florida resident who lives in Palm Beach, said that he was solicited in Florida to purchase an interest in the Palm Court Hotel. Richard Strother, testifying by deposition, stated that he had solicited former Congressman L. A. Bafalis, in Florida, to purchase a hotel interest.

Second, pursuant to the terms of the offering, PCI retained the right to accept or reject potential purchasers at the closing, which was scheduled for December 30 and 31, 1985, in Boca Raton, Florida. As it turned out, the offering was obersubscribed and, therefore, PCI did exercise its right of selection. "[E]nforceable rights which are the hallmark of a sale . . . ," *Feitler v. Midas Associates,* 418 F.Supp. 735, 738 (E.D. Wis. 1976), came into being at the closing. Thus, under a traditional "last act" analysis, Florida law would be applicable.

Third, the facts of this case negate any legitimate concern that due process would be violated by applying Florida law. Although the court

32

has not relied solely on the "territorial analysis" advocated by the unit owners, it is clear that this transaction abounds with significant Florida contacts. All offering documents were drafted here; all preliminary negotiations and decisions about the offering were made here; the subscription documents stipulate that "[t]he parties intend this to be a Florida contract, agree that it shall be construed pursuant to Florida law, and further agree that any action or proceeding arising out of this Agreement shall be instituted in the appropriate courts of Florida . . . ;" the real property is here; the performance of the rental management agreement and other contracts was to take place here; and the mortgage payments and taxes were to be paid here. Without question, there is a substantial nexus between the Palm Court offering and the State of Florida and, consequently, this ground alone would support an assertion of state jurisdiction. *See, e.g., Benjamin v. Cablevision Programming Investments,* 114 Ill.2d 150, 499 N.E.2d 1309 (1986); *Petrites v. J.C. Bradford & Co.,* 646 F.2d 1033 (5th Cir. 1981); *Lintz v. Carey Manor Ltd.,* 613 F.Supp. 543 (W.D. Va. 1985).

(3) Palm Court's PPM contained material misrepresentations and omissions in violation of section 12(2) of the Securities Act of 1933, 15 U.S.C. section 77a et seq.

The test of materiality is whether there is a substantial likelihood that a reasonable investor would consider the omitted facts or misrepresentations important in deciding whether to invest. *See TSC Industries, Inc. v. Horthway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Currie v. Cayman Resources Corp.,* 835 F.2d 780 (11th Cir. 1988); *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680 (5th Cir. 1971).

Applying this test to the case at bar, the court concludes that the following constitute material misrepresentations:

(A) That $75,000 of the sales proceeds would be placed in a hotel working capital fund;

(B) That $300,000 would be utilized for "advertising";

(C) That the closing would not occur until the hotel had received a certificate of occupancy;

(D) That the hotel would have a $30,000,000 umbrella insurance policy and that there would be property damage coverage in the amount of $12,500,000.

Similarly, the following constitute material omissions:

(A) That the Palm Court had missed the 1986 high season;

(B) That the restaurant upgrading would have a material, negative impact on the PKF projections;

(C) That Chef Surmain's independent status would have a material, negative impact on the PKF projections;

(D) That the dispute between Chef Surmain and the hotel management would have a material, negative impact on the PKF projections;

(E) That PCI had lost confidence in P-V, the hotel agent, and that P-V would have to be replaced;

(F) That P-V questioned the validity of the PKF projections;

(G) That the principals of PCI were suing Thomas Vavra for fraud, theft, racketeering, etc.;

(H) That the Palm Court constituted a nonconforming use and structure.

(4) PCI failed to demonstrate that the Palm Court offering is exempt from registration under federal and state law.

The party asserting the affirmative defense of exemption from registration bears the burden of establishing the defense. *Swenson v. Engelstad,* 626 F.2d 421 (5th Cir. 1980); *Doran v. Petroleum Management Corp.,* 545 F.2d 893 (5th Cir. 1977). Moreover, at least with respect to the state exemption in section 517.061(11)(a), Florida Statutes (1985), it is available "only if all five specified statutory conditions are established. . . ." *Weinberg v. Pennington,* 462 So.2d 862, 863 (Fla. 3d DCA 1985).

Specifically, PCI failed to demonstrate that (1) it had made full and fair disclosure of all material information, (2) the offering was private, *i.e.,* without a general solicitation and advertising, *see SEC v. Murphy,* 626 F.2d 633 (9th Cir. 1980); *McDaniel v. Campania Minera Mar de Cortes, Sociedad Anonimo, Inc.,* 528 F.Supp. 152 (D. Ariz. 1981), and (3) it had a reasonable belief that the investors were "suitable" within the meaning of Regulation "D", 17 CFR section 230.506.

(5) PCI sold unregistered securities in violation of section 517.07, Florida Statutes (1985), and section 5(a) of the Securities Act of 1933, 15 U.S.C.A. section 77e.

(6) PCI, Carl Sax and Lanny Horwitz, in violation of section 517.301, Florida Statutes (1985), purposely, with intent to defraud, made material misrepresentations and caused omissions of material facts in the PPM to induce investors to purchase hotel interests in the Palm Court Hotel.

In reaching this determination, the court has rejected the unit owners' contention that mere negligence will support a violation of section 517.301, Florida Statutes (1985).

PCI, Carl Sax and Lanny Horwitz made the following misrepresentations and omissions of material facts in violation of section 517.301, Florida Statutes (1985):

(A) That $75,000 would be paced in the hotel's working capital account;

(B) That the hotel had received a certificate of occupancy;

(C) That the announced level of insurance had been obtained;

(D) That the Palm Court had missed the 1986 season;

(E) That PCI had lost confidence in P-V and that P-V would have to be replaced;

(F) That P-V questioned the validity of PKF's projections.

(7) In light of the foregoing findings of fact and conclusions of law, the unit owners are entitled to recission and to an award of incidental damages. The amount requested during final argument is supported by the evidence. The court, however, declines to award punitive damages. Furthermore, upon entry of the final judgment, the court will reserve jurisdiction to award costs and attorney's fees pursuant to state statute.

DONE and SIGNED in Chambers at West Palm Beach, Florida, this 28th day of March, 1988.